Robert C. SPILLERS, Appellant,

v.

CITY OF HOUSTON, Appellee.

No. 01–88–01038–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 31, 1989.

Jack Swisher, Houston, for appellant.

Diana K. Ball, Floyd, Taylor & Riley, Houston, for appellee.

Before EVANS, DUNN and MIRABAL, JJ.

## OPINION

EVANS, Chief Justice.

This is a workers' compensation case.

The appellant sought workers' compensation benefits for three separate injuries he sustained while working for the City of Houston. A jury found that the appellant sustained compensable injuries on the three dates alleged, and that two of the injuries were a producing cause of temporary periods of total incapacity. But the jury failed to find that the appellant sustained any permanent partial incapacity as a result of such accidents. Because the City had already paid weekly compensation benefits for the periods of the appellant's total incapacity, the trial court entered a take-nothing judgment in favor of the City.

In the appellant's sole point of error, he complains that the jury's finding that he did not sustain any permanent, partial incapacity is against the great weight and preponderance of the evidence.

In considering this point of error, we apply the standard of review for factual sufficiency challenges, notwithstanding that the appellant has the burden of proof on the issue. *M.J. Sheridan & Son Co. v. Seminole Pipeline Co.*, 731 S.W.2d 620, 623 (Tex.App.—Houston [1st Dist.] 1987, no writ). Thus, we examine all the evidence in the record, *Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986), to determine whether the jury's finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Garza v. Alviar*, 395 S.W.2d. 821, 823 (Tex.1965); *Otis Elevator Co. v. Joseph*, 749 S.W.2d 920, 923 (Tex. App.—Houston [1st Dist.] 1988, no writ).

The appellant was employed in the City's Water Production Department from 1967 until he resigned in 1983. At the time he resigned, he held the position of chief operator in charge of a water production district. In addition to his supervisory tasks, such as coordinating job crews, keeping time, and checking the crew's work, the appellant also performed "hands-on" work of checking and cleaning water wells, moving chlorine canisters and 55–gallon oil drums, turning valves, climbing well ladders, and mopping plant floors. On each work shift, the appellant made visual inspections of oil and chlorine levels, recorded meter readings, and inspected equipment, machinery, and the physical plant.

While so employed, the appellant injured his left shoulder on three occasions. The jury found no incapacity as a result of the first accident, but found that both the second and third injuries were a producing cause of temporary total incapacity. The jury refused to find any permanent partial incapacity as a result of the three accidents.

The first accident occurred on November 5, 1977, when the appellant slipped and fell, turning his left shoulder. He finished his

shift and saw a doctor the next day, on his day off. He testified that his left shoulder was "awfully sore and hurting," but that he lost no time at work due to the injury. He said he had no difficulty at work because of the first injury.

The second injury occurred on September 16, 1981. The appellant was tightening a valve when he experienced a "searing pain" in his left shoulder. He reported the accident to his supervisor, but he did not seek medical treatment at the time. The pain kept getting worse, and the appellant had little or no use of his left arm and hand. On October 30, 1981, the appellant saw an orthopedic surgeon, Dr. Richard DeYoung, who diagnosed a torn rotator cuff. On November 20, 1981, Dr. DeYoung performed surgery to repair the tear, and in his post-surgery treatment, he recommended exercises and physical therapy. On April 1, 1982, Dr. DeYoung performed a second operation under general anesthesia, manipulating the appellant's shoulder to achieve a greater range of motion. The appellant was "off work" from November 18, 1981, when he was first admitted to the hospital, until May 26, 1982, when Dr. DeYoung released him to return to work without restrictions.

The third injury occurred on June 22, 1982, about one month after the appellant returned to work. While climbing a water tank ladder, the appellant threw all of his weight onto his left arm and injured his shoulder for the third time. The pain in his left arm caused him to release the ladder, and he fell from the bottom rung to the ground, a distance of about three feet, landing on his knees. The appellant saw Dr. DeYoung that same day, complaining of a severe, throbbing pain in his shoulder. Dr. DeYoung took the appellant off work, and prescribed pain medication and physical therapy. On September 1, 1982, Dr. DeYoung did exploratory surgery on the shoulder, but observed no tear of the shoulder joint. He released the appellant to return to work on December 13, 1982, but restricted him to "light" duty. Dr. DeYoung described the appellant's limitations as an impairment of his overhead use of the left arm, weakness of the arm muscles, and shoulder pain. He recommended that the appellant avoid strenuous use of his left arm, and cautioned him to use his shoulder as carefully as possible. Specifically, Dr. DeYoung recommended that the appellant avoid any job duties involving climbing, overhead lifting, and hard manual labor, but he said that the appellant could work within those guidelines.

Following Dr. DeYoung's report, the City offered the appellant three options: (1) to return to work in the same position, with the City's agreement to accommodate his physical limitations; (2) to take a clerical position at a reduced salary; or (3) to retire. After a meeting with his supervisors, the appellant decided to return to work as chief operator because he did not want to take a cut in pay or to quit work. The appellant was instructed to do no lifting, climbing, or valve work, and was told to have his assistant perform any of those functions.

Following his return to work, the appellant said he was unable to perform his duties as chief operator as he had previously done. He said that he had no strength in his shoulder or left arm. He said his shoulder hurt all the time, and he described the pain as severe. He said that, because of the limitation of the left arm and shoulder, he could not do his work as he felt it needed to be done or as he felt the City expected it to be done. He said he could not do any climbing, pushing, pulling, lifting, or mopping, although he acknowledged on cross-examination that the City had ordered him not to do any of those activities. He said the pain made it difficult for him to do his paperwork or to sit still for long. The appellant resigned his job with the City on May 20, 1983. There is conflicting testimony regarding his reasons for quitting. The appellant maintains that he was in constant pain and was unable to perform the work. But the City suggests that there were other motivating factors, including anger over a missed promotion, a poor performance report, and a 10–day suspension without pay for over-greasing a pump.

The appellant had worked in a gas station before he joined the City in 1967, and

he returned to that line of work after he resigned. He quit his job with the City on May 20, 1983, and was not employed again until December 1985. Shortly after he left his job with the City, the appellant was observed performing service station attendant duties at his brother-in-law's gas station. The appellant said that he was never paid for that work, and that he only "hung around" the station to keep from going "stir crazy" sitting at home. He admitted, however, that he did routine service station work about 50% of the time he was at the station, and that he was there as much as 12 hours per day.

In December 1985, the appellant obtained a paying job with another service station. From then until the time of trial, the appellant was employed at various gas stations, making between $4.00 and $4.50 per hour, and he was working as a service station manager at the time of trial. He testified that, in terms of physical demands, the work at the service stations was easier than his previous job with the City because he was not doing any lifting, climbing, or turning valves.

The appellant continued to see Dr. DeYoung for pain in his left shoulder and neck, which he described as a continuous, throbbing pain. Approximately one year after the appellant resigned his job with the City, Dr. DeYoung again performed exploratory surgery on the left shoulder. During this operation, Dr. DeYoung found adhesions, which were divided and released, and the joint was freed and manipulated. Dr. DeYoung testified that he felt that perhaps there were some spurs pinching on the shoulder joint, but he was unable to find any.

In all, Dr. DeYoung saw the appellant 34 times after he performed his initial surgery on November 20, 1981 to repair the appellant's torn rotator cuff. In April 1983, Dr. DeYoung found the appellant still had some difficulty with the left shoulder. He noted an impairment of the range of motion and some slight atrophy of the scapular muscles. In October 1984, the last time Dr. DeYoung saw him, the appellant complained that the pain had come back in his shoulder, and that it was just like it had been before his last operation. Dr. DeYoung concluded that the appellant's injuries are permanent, and that he will suffer these symptoms and disabilities for the rest of his life. Although he said that the appellant can do some kind of work, he said the appellant had a 50% permanent impairment of function of his left arm at the shoulder joint, resulting in impaired overhead range of motion, some weakness of the muscles, and pain in the shoulder.

The appellant continued to complain of pain in his shoulder and neck. He described the pain as a throbbing ache in his left shoulder and arm, extending to his fingertips, which was aggravated by movement of his shoulder. He also had pain on the left side of his neck and numbness in the fingers of his left hand. In 1985, the appellant was referred to Dr. Bruce Enhi for an evaluation. Dr. Enhi said that the appellant complained that he had been in constant pain since he reinjured his shoulder for the third time in June 1982. Objectively, Dr. Enhi observed a restriction in the extension of the neck, and tenderness or pressure over the nerves that ran down from the left shoulder. A myelogram confirmed the existence of a pinched nerve in his neck. Dr. Enhi testified that a pinched nerve in the neck was consistent with an injury to the shoulder. Dr. Enhi performed neck surgery to correct the pinched nerve. Following the surgery, he prescribed a muscle relaxant, pain medication, and anti-inflammatory drugs.

Dr. Enhi testified the neck surgery brought some relief, but the appellant continued to complain of left shoulder pain and neck pain. Dr. Enhi's examination revealed a splinting, give-away weakness to most of the shoulder girdle groups. Dr. Enhi said that, in his opinion, the appellant would be partially disabled to some extent because of his inability to use his left shoulder. Although he did surgery to correct the pinched nerve in the appellant's neck, Dr. Enhi testified that, "When you do an operation on neck problems like this, you almost never get rid of the pain." Dr. Enhi said that, in his medical opinion, the appellant would have some amount of

chronic pain in his neck and shoulder permanently. Dr. Enhi gave the appellant a disability rating of 15% for the whole body. He said the appellant could work, but with certain limitations, i.e., he should avoid lifting more than 50 pounds, and should avoid activities involving strenuous bending, pushing, or pulling.

There was also testimony at trial from Pamela Lewis, a vocational rehabilitation counselor. Taking the appellant's physical limitations into account, Lewis testified that the appellant was physically capable of performing at the "medium" level of physical exertion, as classified by the Department of Labor, including lifting up to 50 pounds, but with no prolonged stooping, pushing, pulling, or overhead work. She testified that the position of chief operator for the City was rated by the Department of Labor as "light" in terms of physical demands, and that the appellant could have continued to work for the City in that capacity. In contrast, she testified that gas station attendant jobs were classified as requiring "medium" physical exertion.

After reviewing the record, we find that there is uncontradicted, objective evidence to support a finding that the appellant suffered some permanent partial incapacity. There was uncontroverted expert medical testimony from Dr. DeYoung that the appellant suffered a 50% permanent impairment of the function of his left arm, and from Dr. Enhi assigning a 15% total body disability to the appellant. Both physicians recommended that the appellant refrain from overhead lifting, bending, pushing, or pulling, and the City does not challenge either the medical diagnosis or the recommendations of these physicians. Indeed, the fact that the City agreed to accommodate the appellant's physical limitations indicates that the City accepted the physicians' conclusions. The City offered no controverting evidence regarding the appellant's medical condition or his future prognosis. The City's only rebuttal testimony related to the reasons for the appellant's resignation and to the appellant's ability to obtain future employment. Thus, the City never challenged the expert opinion of the appellant's physicians that the appellant would have diminished use of his left arm and shoulder, and would, in all probability, experience chronic pain, or that he would be unable to perform the full range of duties he had performed in the past.

The City does not argue that the appellant's condition has changed, that he has regained the full use of his left arm and shoulder, or that he will do so in the future. Indeed, the City argues only that the appellant could have continued his job within the guidelines set out by his doctor, or could have found other employment rated "light" in terms of manual labor.

■ If a worker's capacity and efficiency to work are not the same as before the injury, the worker is entitled to compensation, regardless of the fact that he continues to work and is paid, after the injury, as much or more than he earned prior to or at the time of the injury. *Employers Reins. Corp. v. Ryne,* 531 S.W.2d 156, 160 (Tex. Civ.App.—Houston [1st Dist.] 1975, no writ). Thus, it has been held that a worker's "capacity to earn" wages is not the same thing as actual wages received, and the fact that the worker continued to hold a job and receive pay in excess of that received before the disability is evidentiary only and not conclusive on the question. *Travelers Ins. Co. v. Walkovak,* 390 S.W.2d 75, 79 (Tex.Civ.App.—Houston [1st Dist.] 1965, writ ref'd n.r.e.).

In its brief, the City argues that the appellant, on cross-examination, admitted that the "physical aspects" of his work simply required lifting and carrying a one-gallon oil container, wiping a motor with a cloth, using a household size grease gun, and sweeping or mopping plant floors. According to the City, the appellant acknowledged that the two "strenuous" tasks, which consisted of handling chlorine canisters and 55–gallon oil drums, were not done routinely and involved rolling the drums a few feet and using a chain hoist to move the chlorine canisters. The City refers to the testimony of a former chief operator of another city water production district, who described his day-to-day duties as being primarily administrative, and acknowl-

edged that all heavy and dangerous tasks were done with the assistance of another worker.

■ It is the claimant's burden to establish that an injury was received in the course and scope of employment, *Texas Employers Ins. Ass'n v. Page*, 553 S.W.2d 98, 99 (Tex.1977); that the injury produced total or partial disability, *Garcia v. Aetna Ins. & Sur. Co.*, 542 S.W.2d 477, 479 (Tex. Civ.App.—Tyler 1976, no writ); and the duration of any incapacity. *Texas Employers Ins. Ass'n v. Thames*, 236 S.W.2d 203, 205 (Tex.Civ.App.—Fort Worth 1951, writ ref'd n.r.e.). There is no precise formula by which incapacity can be measured, and the duration and extent of disability is, at best, an estimate, which the jury must determine from all the pertinent facts. *American Home Assurance Co. v. Coronado*, 628 S.W.2d 818, 822–23 (Tex.App.—Amarillo 1981, writ ref'd n.r.e.).

■ Unless the record shows that a jury's finding on an issue is factually insufficient, or so against the great weight and preponderance of the evidence as to be manifestly unjust, the reviewing court may not interfere with the jury's verdict. *American Home Assurance Co.* 628 S.W.2d at 822–23; *see also Sanchez v. Texas Employers Ins. Ass'n*, 618 S.W.2d 837, 840–41 (Tex.App.—Amarillo 1981, writ ref'd n.r.e.). Moreover, because the jury, sitting as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given their testimony, the reviewing court may not substitute its opinion for that of the jury merely because it might have reached a different factual conclusion. *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex.1988); *Benoit v. Wilson*, 150 Tex. 273, 279, 239 S.W.2d 792, 796 (1951).

■ But a reviewing court must set aside a jury's verdict if the record shows that the jury totally ignored the evidence establishing a worker's disability or the duration thereof. *See Aiken v. Texas Employers Ins. Ass'n*, 737 S.W.2d 143, 146 (Tex.App.—Eastland 1987, no writ); *De los Angeles Garay v. Texas Employers Ins. Ass'n*, 700 S.W.2d 657, 658–60 (Tex.App.—Corpus Christi 1985, no writ); *Parker v.*

*Equitable Gen. Co.*, 660 S.W.2d 143, 145 (Tex.App.—Waco 1983, no writ); *Robinson v. Charter Oak Fire Ins. Co.*, 551 S.W.2d 794, 799 (Tex.Civ.App.—Waco 1977, writ ref'd n.r.e.); *Thomas v. Int'l. Ins. Co.*, 527 S.W.2d 813 (Tex.Civ.App.—Waco 1975, writ ref'd n.r.e.). We find that to be the case here.

■ In this case, the evidence affirmatively shows that appellant suffered a permanent partial incapacity, which evidence the City wholly failed to rebut. Both physicians testified that the appellant suffered a partial incapacity and recommended that he refrain from any overhead lifting, bending, pushing, or pulling. The City does not challenge these expert conclusions or recommendations. The City offered no controverting evidence, either with respect to the appellant's medical condition or regarding his future prognosis. Although the City offered evidence of possible other reasons for the appellant's resignation, and about the appellant's ability to procure "light" employment, that showing did not contradict the medical testimony establishing the appellant's partial incapacity.

In *Guerra v. Texas Employers Ins. Ass'n*, 343 S.W.2d 306, 308 (Tex.Civ.App.—San Antonio 1961, no writ), the court wrote:

> It is well settled that partial disability within such laws means that an employee, by reason of injury sustained in the course of his employment, is only able to perform part of the usual tasks of a workman, but, nevertheless, is able to procure and retain employment reasonably suitable to his physical condition and ability to work, or is only able to perform labor of a less remunerative class than he performed prior to his injury, whereby he suffers a depression or reduction in his earning capacity.

Here, because of one or more injuries sustained during the course and scope of his employment, the appellant was unable to perform his usual tasks, a fact that the City acknowledged when it agreed to accommodate his physical limitations if he returned to work. The City does not argue

that the appellant's condition has changed, that he has regained the full use of his left arm and shoulder, or that he will do so in the future. Indeed, the City argues only that the appellant could have continued his job as chief operator within the guidelines set out by his doctor, or could have found other employment rated "light" in terms of manual labor.

The fact that the appellant was able to procure and retain employment reasonably suitable to his reduced physical capabilities, i.e., as a service station manager, after he resigned his job with the City does not conclusively establish a finding that he suffered no permanent partial disability. His capacity and efficiency to work were clearly not the same following his injury as they were before. The fact that an injured employee continues to work and make money after his injury does not constitute any bar to his recovery for permanent disability. *Employers Mut. Liab. Ins. Co. v. Gallardo*, 359 S.W.2d 933, 935 (Tex.Civ.App.—Waco 1962, writ ref'd n.r.e.). Even if the employee was paid more than he earned prior to the time he was injured, that is not conclusive of whether he suffered a permanent reduction in his ability to perform his usual duties. *Standard Accident Ins. Co. v. Mize*, 378 S.W.2d 686, 688 (Tex.Civ.App.—Amarillo 1964, no writ). Furthermore, in this case, the appellant's job at the time of trial, as a gas station manager, paid less than his former job with the City.

We find the evidence affirmatively establishes the appellant's injury in the course and scope of his employment, and that this injury necessitated lighter duties. We conclude that the jury's finding that the appellant did not suffer partial, permanent disability is not supported by the record, and is against the great weight and preponderance of the evidence.

Appellant's point of error is sustained.

The judgment of the trial court is reversed, and the cause is remanded.